**STATE of Missouri, Respondent,**

v.

**Rhonda L. SAGE, Appellant.**

**No. WD 54039.**

Missouri Court of Appeals,
Western District.

Submitted April 15, 1998.

Decided Aug. 11, 1998.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Sept. 22, 1998.

Application to Transfer Denied
Oct. 21, 1998.

---

1.  All statutory references are to RSMo 1994.

Susan L. Hogan, Appellate Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Cristi A. Ingalsbe, Asst. Atty. Gen., Jefferson City, for respondent.

Before ULRICH, C.J., P.J., and SMART and LAURA DENVIR STITH, JJ.

SMART, Judge.

Rhonda L. Sage appeals her conviction, after jury trial, on one count of endangering the welfare of a child in the first degree, § 568.045, RSMo 1994[1], for which she was sentenced to three years imprisonment. She contends that the trial court erred in overruling her objections to the State's use of peremptory strikes to remove venirepersons Don Tate, Connie Crutcher and Teisha Ingram. Ms. Sage also claims that the trial court erred in overruling her pretrial motion in limine and her objections at trial to the admission of evidence that her parental rights to another child were terminated. Judgment is affirmed.

## Background

After midnight on July 12, 1996, Paul Lewis decided to visit an old girlfriend, although he was uncertain of where she lived. One of her old neighbors directed him toward a house in the Euclid area where it was thought that she might be found. As Mr. Lewis approached the house he thought he heard a baby crying. He knocked on the door of the house and the door fell open. A little girl, twenty-month-old Kristina Carter, grabbed him and would not let go. The child was shaking and distraught. Mr. Lewis went into the house to see if anyone was there, but did not see anyone at the house. Mr. Lewis went to the phone, but had to leave the house because it "reeked."

Mr. Lewis went outside where his brother and his brother's girlfriend were waiting. He told them about the child and they discussed what to do. They decided to take the little girl to the police station. At this point, about fifteen minutes after his arrival at the house, Mr. Lewis noticed a patrol car. He flagged the car down and told the police officer about the child. Brian Templeton of the Kansas City Police Department was stopped by Mr. Lewis at approximately 1:21 a.m.

Officer Templeton went inside the house to see if there were any more children present. He found none. He began to look for the parent of the little girl and went around the neighborhood from door to door. Officer Templeton described the inside of the house as "horrible." He testified that there was trash all over the floor and an awful smell. Officer Templeton was able to determine who owned the house. He contacted the caretaker of the residence, Willie Turner.

After Mr. Turner arrived at the house the appellant, Rhonda Sage, arrived at the scene at approximately 2:10 a.m. Ms. Sage said that she was the mother of the child, Kristina Marie Carter, who was about twenty months old at the time. Ms. Sage said that she had only been gone for fifteen minutes. When told that the police had been at the scene for close to an hour and that she was going to be arrested for child endangerment, she became hostile and belligerent, kicking, screaming and calling the officers names.

Police Officer Deborah Yelverton searched the house in which Kristina was found. Just inside the house, in the foyer area, she noticed a bucket containing knives. The living room was cluttered with papers, boxed items, trash and clothing. In the dining room she found a bottle of Irish Rose, an alcoholic beverage, within the reach of a child. The

1. All statutory references are to Revised Statutes of Missouri 1994, unless otherwise indicated.

kitchen had food and dirty dishes on the cabinets. The refrigerator was filled with spoiled food. There was no water within the reach of the child. Officer Yelverton found a bottle of ammonia on a kitchen chair. In the bathroom area, adjacent to the kitchen, she observed human waste in the toilet and laundry on the floor. The upstairs bedrooms were cluttered with trash and clothing. Between the bedrooms was a two or three inch gap, exposing wires.

Ms. Sage was interviewed by Detective Wayne Owings of the Kansas City Police Department. Ms. Sage told Detective Owings that she had gone to a drive-in movie with a man named Curtis. When Officer Owings asked how to contact Curtis, Ms. Sage told him that she did not know Curtis' last name, his address or his telephone number. She stated that on the way home from the movie, they had a flat tire at Linwood and Paseo. She left her car in a parking lot and walked to her aunt's house. From there she called a friend named Dave to take her to get some cigarettes. She claimed that she had left Kristina at the Euclid house with her cousin, Willie Turner. Ms. Sage claimed to have driven to Kansas City, Kansas to look for one of her children and that when she returned she found the police at the house on Euclid. Ms. Sage told essentially the same story to Dawn DeSmet, an investigator for the Division of Family Services.

William Turner testified that he was Rhonda Sage's second cousin. The house on Euclid belonged to his mother who had been placed in a nursing home. Ms. Sage had lived with Mr. Turner's mother at one point, but had been told to leave. She did not have permission to be at the house. Neighbors had seen Ms. Sage coming and going from the house, but Mr. Turner was never able to catch her there. Mr. Turner denied that Ms. Sage had left Kristina with him. He stated that Ms. Sage did not even know his telephone number and noted that he had not seen Ms. Sage in months.

The jury found Ms. Sage guilty of endangering the welfare of a child in the first degree. Ms. Sage was sentenced to three years imprisonment. She appeals.

## Batson Challenges

Ms. Sage contends that the trial court erred in overruling defense counsel's objections to the State's use of peremptory strikes to remove three minority venirepersons, Don Tate, Connie Crutcher, and Teisha Ingram. She claims that she was denied her right to equal protection under the law as guaranteed by the Fourteenth Amendment to the United States Constitution and by Article 1, § 2 of the Missouri Constitution because she made a *prima facie* case of the racially discriminatory exercise of peremptory challenges by the State. She claims that the State's explanations for its strikes were not race-neutral and were pretextual because similarly situated white venirepersons remained on the jury.

The State's use of peremptory challenges to exclude jurors on the basis of their race or their gender is forbidden under the Equal Protection Clause. *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986). Missouri utilizes a three-step process for *Batson* challenges. *See State v. Parker*, 836 S.W.2d 930, 939 (Mo. banc 1992). The first step in the process requires that a defendant raise a *Batson* challenge to venirepersons struck by the State, identifying a cognizable racial group to which the challenged venirepersons belong. Next, the State must provide a race-neutral explanation for the strike that is reasonably specific. Finally, assuming that the State provides such a reason, the defendant shoulders the burden of showing that the State's reasons are pretextual and that the strikes are, in actuality, racially motivated. *Id.* The State's justification for making a peremptory strike need not rise to the same level as the justification for a challenge for cause. *State v. Hall*, 955 S.W.2d 198, 205 (Mo. banc 1997), *cert. denied*, — U.S. —, 118 S.Ct. 1375, 140 L.Ed.2d 523 (1998).

Unless an inherently discriminatory intent is found in the State's explanation, the strike will be upheld. *State v. Roberts*, 948 S.W.2d 577, 601 (Mo. banc 1997). In evaluating the State's explanation for its strikes, a trial court is directed to look at the susceptibility of the case to racial discrimination, the demeanor of the prosecutor and the explana-

tion itself. *Id.* at 601–02. We will not overturn the trial court's finding on appeal unless that finding is shown to be clearly erroneous. *State v. Gray*, 887 S.W.2d 369, 384 (Mo. banc 1994). A finding is considered clearly erroneous where "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *State v. Antwine*, 743 S.W.2d 51, 66 (Mo. banc 1987).

### Venireperson Don Tate

█ Ms. Sage argues that the trial court erred in overruling her *Batson* challenge to the State's use of a peremptory strike against Don Tate, an African–American venireperson. The State explained that Mr. Tate had been struck because "his son had been prosecuted by the State's office. He had some unhappiness with Judge Rogers, and he was unhappy with the Division of Family Services." The defense challenged the State's strike, claiming that another juror had a son that was prosecuted and that he was not struck. The trial court found that the State's reasons for its strikes were not pretextual. The trial court did "not feel that there was anything in the history of Ms. Putnam or Mr. Miller to cause me to be concerned about them being improperly racially motivated in their strikes."

During voir dire, the panel was asked whether any of them knew any judges. Venireperson Tate indicated that he had litigated a child custody issue before Judge Sill–Rogers and felt that he had not been treated fairly by the court or by the DFS. Mr. Tate attempted to get custody of his children. He claimed that the children's mother had left them alone more than once and that he had hotlined her. In addition, Mr. Tate's son had been prosecuted for robbery in Jackson County. Mr. Tate stated that he could be fair and impartial.

Ms. Sage contends that the State's strike was pretextual because a similarly situated white venireperson was not stricken. However, the record shows that the white venireperson was not similarly situated. The white venireperson's son was prosecuted for a crime, but the venireperson was uncertain of the details or where the crime had been prosecuted. Furthermore, this venire member expressed no dissatisfaction with the DFS or with any judge. Mr. Tate's expressed dissatisfaction with the court and with the DFS were valid reasons for the exercise of a peremptory strike. Ms. Sage has not demonstrated that the strike was pretextual.

### Venireperson Connie Crutcher

█ The State struck venireperson Connie Crutcher because, "she is trying to convince everyone else on the panel to rely on or to opt forces to prove elements not required and rely on other things other than the law." Ms. Crutcher is identified in the record as Hispanic. During *voir dire*, the following exchange took place:

MR. EULER: Does anybody have anything like that you want to bring to our attention now, either out loud or at the bench? Ms. Crutcher?

VENIREMAN CRUTCHER: The only question I have is if I was to be chosen for a juror and I sentenced her to five years imprisonment or whatever, am I not supposed to care about the child's welfare? Is that not a question that I should ask myself? She is the mother, right?

MR. EULER: Right.

VENIREMAN CRUTCHER: Is that something I should worry about or something I should not worry about?

MR. EULER: I guess that's something in your own mind you have to justify and decide about.

VENIREMAN CRUTCHER: So it won't be a question that's going to come up to us that we should even consider; that the child is going to lose its mother?

MR. EULER: I think that's something for you to sit there and in deciding the case to think about in your own mind and decide based on what you've heard. I guess is that a good enough answer, Your Honor?

VENIREMAN CRUTCHER: I mean, shouldn't we as peers, shouldn't we mothers and fathers worry about the child also?

Is that not something that should come into our line of thinking?

MR. EULER: I think it should, but it's up to you to consider if you were selected as a juror. Anybody else?

Ms. Sage characterizes Venireperson Crutcher's questions as "thoughtful and thought-provoking questions by a conscientious venire person seeking guidance as to what effect her concerns should have on her deliberations." Ms. Sage dismisses the State's reason for its peremptory challenge as not legitimate and not race-neutral because, she contends, Ms. Crutcher's questions did not show an inability to follow the law or to set aside personal concerns. Even if we accept Ms. Sage's characterization of Ms. Crutcher's questions, the tenor of the questions support the prosecution's contention that they show that Ms. Crutcher was considering issues outside of the law and was trying to convince the rest of the panel to look outside the required elements for the offense. It is obvious that Ms. Crutcher would consider the future of the child in her deliberations and that the outcome of the case would, to some extent, depend on what was going to happen to the child. She does not limit her inquiries to what she alone should consider, but asks about the what all the jurors should consider as "peers" and as "mothers and fathers." The trial court accepted the State's reason for the strike. We do not find its determination to be clearly erroneous.

### Venireperson Teisha Ingram

■ Ms. Sage challenges the State's explanation of its strike of Teisha Ingram, an African–American. The State struck Ms. Ingram because Ms. Ingram raised the issue of whether the defendant was a single mother and her jury questionnaire indicated that she was a single mother. Ms. Sage contends that there were similarly situated white members of the panel who were not stricken, Joyce Jackson, who had two grandchildren under the age of ten, and Daphne Osborne, who had a five-month old child. When challenged by the defense, the State claimed that it did not strike Ms. Ingram because she was a single mother but because she volunteered

the question which indicated that she had some concerns on the issue. The jurors that Ms. Sage contends are similarly situated did not voice such concerns. Ms. Ingram's question about Ms. Sage followed immediately after Ms. Crutcher's questions concerning the child's welfare. The State's reason for the strike was race-neutral. We do not find that the trial court's determination that this reason was not pretextual is clearly erroneous. Point I is denied.

### Evidence of Prior Abandonment of Another Child

■ Ms. Sage argues, in Point II, that the trial court erred in overruling her motion in limine and in overruling her objections at trial to the State's evidence that her parental rights to another child had been terminated. She contends that she was denied her right to due process of law and to a fair trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by Article 1, §§ 10 and 18(a) of the Missouri Constitution because that evidence constituted evidence of other bad acts and had no legitimate tendency to establish that she knowingly endangered the welfare of her daughter, Kristina Carter.

At trial, the judge read excerpts from a judgment terminating Ms. Sage's parental rights to her son, Carnelius Anthony Sage. The judge read:

On the 9th day of June, 1994, the juvenile officer's petition for termination of parental rights filed on March 9, 1994, came on for hearing. Having considered the pleadings filed and evidence adduced, the Court makes the following findings of fact and conclusions of law.

Carnelius Anthony Sage is a male child born in Kansas City, Jackson County, Missouri, on the 24th day of July, 1991, who resides in Jackson County, Missouri. The child's mother is Rhonda Sage whose date of birth is December 19, 1975, and whose current address is unknown.

The child was detained in foster care pursuant to a petition filed September 18, 1991, which alleged the child is without proper care, custody, and support, and that his mother is a 16–year–old ward of this

court who failed to return to her assigned foster home after school on September 16, 1991, and the child was taken into protective custody at his baby-sitter's the following day when the mother was still unaccounted for.

Elaine Bridges, the Division of Family Services worker, testified that she had been the case worker since January 30, 1994. She testified that the mother had been involved with Division of Family Services since September, 1991, and had been offered services which included parenting classes, individual therapy, and family therapy. She testified that the mother had no contact with her son after October 29, 1993, and that her whereabouts were unknown after that date.

The Court finds by clear, cogent, convincing evidence that Carnelius Sage has been under the jurisdiction of the juvenile court for a period exceeding one year. The evidence shows the mother has had no contact with the child and has provided no financial support for the child since October 29, 1993. The parents have shown lack of interest in the child and lack of commitment to the child. Wherefore, it is hereby ordered, adjudged, and decreed that all parental rights of Rhonda Sage in, to, and over the child Carnelius Sage be terminated.

One of the basic principles of our system of justice is that an accused has the right not to be found guilty or punished for a crime for which he is not on trial. *State v. Conley*, 873 S.W.2d 233, 236 (Mo. banc 1994). Therefore, evidence of uncharged crimes, wrongs or acts is generally inadmissible for the purpose of showing that a defendant has a propensity to commit crimes, including the crime for which he is on trial. *Id.* A defendant has the right to be tried only for the crimes with which he has been charged. *State v. Skillicorn*, 944 S.W.2d 877, 886 (Mo. banc 1997). However, there are exceptions to the general rule. *State v. Clover*, 924 S.W.2d 853, 855 (Mo. banc 1996). If evidence is logically and legally relevant, it is deemed admissible. *Id.* Evidence is logically relevant if it has some legitimate tendency to directly establish the guilt of the accused of the

charge for which he is on trial, as, for example, when it tends to establish motive, intent, a common scheme or plan, or the absence of mistake or accident. *Id.* Legal relevance is demonstrated where the probative value of the evidence outweighs its prejudicial effect. *State v. Bernard*, 849 S.W.2d 10, 13 (Mo. banc 1993). The trial court is in the best position to ascertain the prejudicial effect of the evidence. *Gray*, 887 S.W.2d at 386.

Section 566.025, RSMo 1994 provides:

In prosecutions under chapter 566 or 568 involving a victim under fourteen years of age, whether or not age is an element of the crime for which the defendant is on trial, evidence that the defendant has committed other charged or uncharged crimes involving victims under fourteen years of age shall be admissible for the purpose of showing the propensity of the defendant to commit the crime or crimes with which he is charged, provided that such evidence involves acts that occurred within ten years before or after the act or acts for which the defendant is being tried.

Ms. Sage was prosecuted under § 568.045. The State has legislatively determined that, in the prosecution of certain crimes involving children, the commission of a prior similar crime against a child is legally relevant—that is, the probative value outweighs the prejudicial effect—when the prior incident shows a "propensity" of the defendant to commit the crime or crimes with which the defendant is charged. In this case, the crime charged is endangerment of a child. The prior act was abandonment of a child. Both the prior act and the current allegation demonstrate lack of commitment to caring for one's offspring, which would ordinarily be a high priority commitment of a good parent. However, the failure to exercise responsibility toward a child is a general character defect. We are not persuaded that failure to care for children is a particular "propensity" such as a tendency to exploit children sexually for the purpose of the perverse sexual gratification of the perpetrator. The fact that this mother, at sixteen years of age, abandoned her child demonstrates that, at least at that time, she was seriously lacking in responsibility and character. And it raises the presump-

tion that Ms. Sage is not a fit mother for any of her children. But this is a criminal prosecution, rather than a termination of parental rights case. Ms. Sage's earlier actions do not so strongly show a propensity or tendency to abandon children as to make it more likely than not that she committed the offense of child endangerment here. Therefore, we doubt that Section 566.025 is applicable in this instance. However, we need not specifically decide whether the trial court erred in admitting this evidence unless the admission of the evidence would be prejudicial error.

Defendant fails to provide us with a specific analysis on the issue of prejudice. Our review of the evidence shows overwhelmingly that the child, at 20 months of age, was allowed to wander alone in a house full of dangers. The child had access to knives, alcoholic beverages, ammonia, spoiled food, human waste, exposed electrical wires, and abundant trash. The door was unsecured. The evidence showed that the child was left alone for at least four hours while the defendant was gone in the company of a friend. The evidence showed that her next door neighbor, seeing the defendant out earlier in the day, had asked defendant about Kristina, and was told, falsely, that Kristina was visiting her great-grandmother. The neighbor had taken care of defendant's children in the past, and was interested in Kristina's welfare. The evidence also showed that the child, when discovered, was distraught and shaking. The defendant presented no direct evidence in her own defense, relying instead solely on information admitted into evidence by the prosecution to suggest mitigating circumstances (such as defendant's assertion at the time of her questioning that her friend had had a flat tire). No evidence was presented that defendant took any action, such as attempting to call a neighbor or a friend, to care for the children. No evidence was presented suggesting that the apparent dangerous conditions were not dangerous. Her guilt was a foregone conclusion, with or without the evidence of the prior act of abandoning a child. A fair reading of defendant's closing argument shows that it was primarily a plea for leniency in the sentence recom-

mendation. Quite properly, it could not have been a serious argument for acquittal.

 The admission of inadmissible evidence will be presumed prejudicial unless it is held to be harmless beyond a reason doubt. *State v. Miller*, 650 S.W.2d 619, 621 (Mo. banc 1983). We conclude that the error in this case was harmless beyond a reasonable doubt because of the overwhelming evidence of guilt.

The judgment is affirmed.

ULRICH, C.J., P.J., and LAURA DENVIR STITH, J., concur.