STATE of Missouri, Respondent,

v.

William O. DUNSON, Appellant.

No. WD 54278.

Missouri Court of Appeals,
Western District.

Nov. 17, 1998.

Gary E. Brotherton, Asst. Public Defender, Columbia for appellant

Jeremiah W. (Jay) Nixon, Attorney General, Jefferson City Philip M. Koppe, Assistant Attorney General, Kansas City for respondent

Before Presiding Judge ALBERT A. RIEDERER, Judge HAROLD L. LOWENSTEIN and Judge LAURA DENVIR STITH.

LAURA DENVIR STITH, J.

Defendant–Appellant William Dunson was convicted of second-degree murder, three counts of endangering the welfare of a child in the first degree, two counts of assault in the second-degree, two counts of armed criminal action, and a single count of abuse of a child. On March 27, 1997, the defendant was sentenced to 75 years in prison. The defendant asserts the trial court erred in: (1) overruling his motion for judgment of acquittal, (2) precluding him from calling a witness to impeach a witness for the State, (3) sentencing him for both endangering the welfare of a child and abuse of a child in alleged violation of the double jeopardy clause, and (4) permitting the State to present evidence which did not tend to prove his propensity to assault or abuse his children. Finding the evidence supports the judgment and that no prejudicial error occurred, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On March 27, 1996, the defendant received a telephone bill containing charges for three calls to phone-sex lines. The defendant questioned his sons to find out if one of them had made the calls. When the defendant asked his two elder boys, William, then age 12, and Dayvon, then age 10, if they had made the calls, Dayvon told the defendant he believed their sister, Elena, had one of the phone numbers.

Elena, then 13 years old and 27 weeks pregnant, was summoned by the defendant. Elena testified that when she walked up the stairs to see the defendant, she could feel her baby moving and kicking. The defendant asked Elena if she made the calls and she denied doing so. Upon her denial, the defendant began to beat Elena, hitting her leg with a croquet mallet and smacking her in the face with the back of his hand. Elena fell against a tool chest. When she got to her feet, the defendant kneed her in the abdomen. Elena testified that after the defendant kneed her abdomen, she felt the baby fall against her kidneys and slide down to her bladder. She further stated that she grabbed her stomach proclaiming, "My baby." To this, the defendant replied, "D right your baby, you're costing me money." He then told Elena to bring him the phone number she had. Elena retrieved the phone number, but when she showed it to the defendant he realized it was not the number to

which the telephone calls on his bill had been made. Elena left the room complaining of stomach pains.

Next, the defendant began hitting Dayvon and William. The defendant asked another one of his sons, Damykis, to bring him a leather belt soaked in a pot of hot water. He instructed Dayvon and William to remove their clothes and then used the hot, wet belt to whip both boys all over their bodies. It was William who finally told his father that he had made the calls. The defendant whipped William with the belt again and then ordered the boys to gather their clothes and leave the room.

Shortly thereafter, Elena telephoned her mother, Lisa, to tell her what had happened. Lisa returned home and bandaged the children's injuries. When she felt Elena's stomach, she did not feel the baby moving. The following day, March 28, 1996, the defendant asked Elena if her baby had moved. When Elena told him that it had not, he said, "If I killed your baby, good because that little b_____ didn't deserve to live anyway." Lisa informed the defendant that she was going to have one of her friends drive Elena to the hospital, to which the defendant responded, "Don't you ever ask someone to do something for my daughter, my child." At that point, Lisa left the house and called the police from a pay phone.

The police arrived, called an ambulance for Elena, arrested the defendant for child abuse, and took William and Dayvon to the hospital. At the hospital, Richard Marble, M.D., examined Dayvon and William and found numerous marks and bruises on both boys consistent with injuries from a beating with a belt. An ultrasound was performed on Elena which showed no fetal heartbeat. On March 29, 1996, 41 to 42 hours after the defendant's beating, Elena's daughter, Kaylesha Davis, was delivered stillborn by Sarah Reynolds, M.D. Dr. Reynolds opined that Kaylesha would have been a viable fetus at 27 weeks and 5 days of gestation.

At trial, several physicians testified as to their opinion of Kaylesha's time of death in relation to the defendant's beating of Elena. Dr. Reynolds testified to observations of damage to the fetus consistent with trauma and estimated that the fetus had been dead approximately 48 hours prior to her delivery. The Jackson County Medical Examiner, Thomas Young, M.D., testified that the cause of death was maternal blunt trauma and opined that Kaylesha had been dead in utero for no longer than 48 to 72 hours. The defendant solicited contrary testimony from Michael Berkland, M.D., as an expert in the field of pathology. Dr. Berkland testified that evidence of skin maceration and autolysis of the organs showed the baby had been dead in utero for closer to three days prior to the delivery. However, the State supplied a rebuttal expert, Robert Garola, M.D., who opined that the skin maceration was minor and estimated Kaylesha's death was closer to 6 to 24 hours before delivery.

The jury found the defendant guilty of second-degree murder of Kaylesha, endangering the welfare of Elena, William and Dayvon in the first degree, second degree assault of Elena and William, armed criminal action of Elena and William, and abuse of Dayvon. He was sentenced to a total of 75 years in prison.

## II. STANDARD OF REVIEW

We give deference to the trier of fact when reviewing the sufficiency of the evidence supporting a criminal conviction. *State v. Grim*, 854 S.W.2d 403, 414 (Mo. banc 1993). Our standard of review is whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *Id., citing, State v. Dulany*, 781 S.W.2d 52 (Mo. banc 1989). We view the evidence in the light most favorable to the prosecution. *Id.*

## III. EQUALLY VALID INFERENCES RULE

The defendant's first point on appeal asserts that the trial court erred in denying his motion for judgment of acquittal and in entering a judgment of conviction in accordance with the jury verdict for second-degree murder. The defendant argues that the State's evidence was insufficient to establish his guilt for the murder of Kaylesha. He contends the evidence simply supported two

"equally valid inferences," one that he caused Kaylesha's death, and the other that something else did for which he was not responsible. The equally valid inferences rule provides that when "the evidence presents two equally valid inferences, one of defendant's guilt and the other of his innocence, it does not, as a matter of law, establish guilt beyond a reasonable doubt." *State v. Dooley*, 919 S.W.2d 539, 541 (Mo.App.1995).

We reject defendant's argument on two grounds. First, our Supreme Court has unequivocally rejected the equally valid inferences rule, stating:

> Because the equally valid inferences rule is at war with the due process standard governing an appellate court's review of the sufficiency of evidence, the equally valid inferences rule should no longer be applied. Rather, the standard to be applied is the due process standard . . .

*State v. Chaney*, 967 S.W.2d 47, 54 (Mo. banc 1998). Thus, even if we believed that the evidence supported two equally valid inferences, one of innocence and one of guilt, we would not reverse, because there was substantial evidence in the record which, if believed by the jury, supported the jury's finding that defendant was guilty beyond a reasonable doubt.

■ Second, we disagree with defendant's contention that the evidence supported equally valid inferences. Defendant asserts that his expert testimony, that Kaylesha displayed physical conditions normally not present unless a fetus has been dead in utero for more than 50 hours, supported his theory that Kaylesha died from other causes before he kneed Elena in the abdomen. The defendant also cites to evidence that Elena had poor health and poor prenatal care, and argues that Elena's pregnancy was at risk for intrauterine growth retardation and stillbirth, and asserts that this could have been the cause of Kaylesha's death. He argues

that this evidence permitted "equally valid inferences" to be drawn that Kaylesha either died before he kneed Elena in the abdomen, or died after he kneed Elena's abdomen.

We do not agree. Although the defendant presented an expert who testified that Elena's fetus exhibited physical signs which showed that the fetus had been dead close to a day prior to when the defendant beat Elena,[1] the State also presented expert testimony contrary to the defendant's theory.[2] Further, the defendant failed to establish any substantial evidence to support his theory that the fetus died from intrauterine growth retardation prior to the beating. No testimony was offered regarding the causes of intrauterine growth retardation and how or whether intrauterine growth retardation played any part in Kaylesha's death.

In addition to this expert testimony, the State presented other evidence from which the jury could conclude the fetus was alive prior to when the defendant beat Elena. For example, Elena testified that she could feel the baby kicking before the defendant beat her, that she felt the baby drop down into her bladder after the defendant kneed her in the abdomen, and that she never felt the baby move again after the beating. The defendant himself commented to Elena that he did not feel the baby deserved to live and that she did not need to go to the hospital. All of this evidence provided the jury with sufficient evidence to find the defendant responsible for Kaylesha's death beyond a reasonable doubt. The mere fact that defendant's experts offered conflicting testimony, which the jury chose not to believe, did not create equally valid inferences. *State v. Brown*, 953 S.W.2d 133, 136 (Mo.App.1997). Point I is denied.

## IV. REFUSAL TO LET DEFENDANT IMPEACH ELENA

■ In Point II the defendant claims the trial court erred in overruling his request to

---

1. Dr. Berkland opined, after reviewing the photographs of skin maceration and slippage from the baby in utero, the degree of autolysis on the microscopic slides, and the portions of the description of the organs by Dr. Young, that the approximate range of the time of death of the baby was closer to 72 hours before delivery.

2. The State's witnesses testified that there was evidence of hemorrhage to the placenta and umbilical cord indicating a trauma and that conditions which normally develop after 48 hours of death in utero, such as slippage, edema, maceration of the skin, and fluids in the organs, were not present to a significant degree.

call Detective Barbara Baker as a witness. The defendant alleges that Detective Baker was needed to testify to a prior inconsistent statement made by Elena. The defendant claims that, in contrast to Elena's testimony at trial that she had never used alcohol, Elena told the detective that she had used alcohol the night she conceived the baby. The defendant argues that this testimony would have supported his claim that the fetus died of intrauterine growth retardation before he kneed Elena's abdomen.

■■■ A defendant can impeach a prosecuting witness with prior inconsistent statements, but the impeachment may not concern an immaterial or collateral matter. *State v. Williams,* 849 S.W.2d 575, 578 (Mo. App.1993), *citing, State v. Foulk,* 725 S.W.2d 56, 65 (Mo.App.1987). A matter is considered to be collateral if the fact in dispute is of no material significance in the case or is not pertinent to the issues developed. *Id.* If an examiner inquires about a collateral matter on cross-examination, he or she must take the answer received and no extrinsic evidence on the issue is permitted so as not to confuse the issues before the jury. *See State v. Taylor,* 944 S.W.2d 925, 934–35 (Mo. banc 1997); *State v. Garner,* 799 S.W.2d 950 (Mo. App.1990). In contrast, "a matter is not collateral if the alleged discrepancy involves a crucial issue directly in controversy or relates to 'any part of the witness' account of the background and circumstances of a material transaction, which as a matter of human experience he would have been mistaken about if his story were true.'" *Williams,* 849 S.W.2d at 578 (citations omitted).

The defendant argues testimony about Elena's previous consumption of alcohol is not a collateral matter because it was crucial to his defense that Kaylesha suffered from intrauterine growth retardation and that Elena's consumption of alcohol was a likely contributor to that condition. We disagree. Whether consumption of alcohol on the day of conception was a likely contributor to intrauterine growth retardation is not a matter within the knowledge of lay persons. To present a foundation for this evidence, defendant would have been required to present

expert testimony that the consumption of alcohol during pregnancy can lead to intrauterine growth retardation and stillbirth. Moreover, since the only evidence of Elena's alcohol use concerned her use of it on the day she conceived, defendant would have had to present some evidence that such a limited use of alcohol so early in the pregnancy could have this effect.

In the absence of such a foundation, the evidence that Elena had used alcohol on the day of conception would only have been relevant to impeach Elena's veracity in stating she never used alcohol. It is not error for a trial judge to exclude offers of extrinsic evidence for impeachment relating to a collateral matter. *State v. Jackson,* 925 S.W.2d 856, 866 (Mo.App.1996), *citing, State v. Taylor,* 486 S.W.2d 239, 244 (Mo.1972). Point II is denied.

## V. DOUBLE JEOPARDY

■ In Point III, defendant argues that his conviction and concurrent sentence under Count IX for endangering the welfare of Dayvon under Section 568.045,[3] and Count VIII for abuse of Dayvon under Section 568.060, subjected him to double jeopardy by punishing him twice for the same offense—beating Dayvon with a belt. The defendant asserts the legislature did not explicitly authorize cumulative punishment under the two statutes. In support of his argument, he cites Section 556.041(3), which states the following:

> When the same conduct of a person may establish the commission of more than one offense he may be prosecuted for each such offense. He may not, however, be *convicted of more than one offense if* . . . [t]he offenses differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct . . .

§ 556.041(3). He claims that under Section 566.041(3) abuse of a child is merely a subset, or specific instance of, endangering the welfare of a child, and thus cannot form the basis for a separate conviction based on the same conduct.

**3.** All statutory references are to RSMo 1994 un-

less otherwise indicated.

■ We disagree. Here, although the conduct which constituted the separate offenses was the same, i.e., beating Dayvon with a belt, this is not the issue. In deciding whether double jeopardy is implicated, we look to the statutory elements of the offense, not the evidence at trial. *Bass v. State,* 950 S.W.2d 940 (Mo.App.1997), *citing, State v. Lane,* 791 S.W.2d 947 (Mo.App.1990). The offenses that the defendant claims constitute the basis of his claim of punishment for the same offense, endangering the welfare of a child under Section 568.045, and abuse of a child under Section 568.060, are not the same for double jeopardy purposes. Section 568.045 defines endangering the welfare of a child as "knowingly acting in a manner that creates a substantial risk to the life, body or health of a child less than seventeen years of age." § 568.045. This statute is intended to prevent any and all types of conduct that involve substantial risk to a child. Clearly, there are many types of conduct other than punishment and abuse which involve substantial risk to a child.

By contrast, Section 568.060(1) defines "abuse of a child" as knowingly inflicting "cruel and inhuman punishment upon a child less than seventeen years old." The statute is intended to prevent abusive and punitive conduct which causes serious emotional injury to a child. *Bass,* 950 S.W.2d at 946. This is not just a subset, or specific instance, of endangering the welfare of a child; it is an independent crime that prohibits cruel and inhuman punishment even if it does not create a substantial risk to the life, body or health of a child. Although the conduct which falls under the two statutes may overlap, neither is a subset of the other.

Accordingly, we find that each statute is intended to prohibit different conduct. Therefore, the defendant's conviction and punishment under both statutes does not violate the double jeopardy provisions of Section 556.041(3). Point III is denied.

## VI. EVIDENCE OF PRIOR FIRE

■ Lastly, the defendant argues the trial court erred in permitting the prosecution to present evidence of a prior fire in his house at a time when he left seven of his young children alone and locked inside the home without heat or utilities. He argues the evidence of the prior fire did not tend to prove any relevant matter and was only presented to prejudice him in the eyes of the jury by characterizing him as a "despicable person."

■ We agree that evidence of other crimes is generally inadmissible for the purpose of showing the propensity of the defendant to commit such crimes. *State v. Bernard,* 849 S.W.2d 10 (Mo. banc 1993). The State argues that the evidence about the fire was nonetheless admissible under an exception to the rule excluding propensity evidence in the case of crimes involving sexual abuse or endangerment of a child under the age of 14. That exception states:

In prosecutions under chapter 566 or 568 involving a victim under fourteen years of age, whether or not age is an element of the crime for which the defendant is on trial, evidence that the defendant has committed other charged or uncharged crimes involving victims under fourteen years of age shall be admissible for the purpose of showing the propensity of the defendant to commit the crime or crimes with which he is charged, provided that such evidence involves acts that occurred within ten years before or after the act or acts for which the defendant is being tried.

§ 566.025.

On its face, this statute appears to be applicable to this case and to justify admission of the evidence about the fire, for the defendant was prosecuted for child endangerment under chapter 568, one of the chapters mentioned in the statute, and on both the former occasion and on the occasion at issue in this case, the child involved was under fourteen years of age.

However, after briefing and argument in this case, the Missouri Supreme Court held that admission of propensity evidence of prior sexual crimes against children under Section 566.025 violates a defendant's constitutional rights because it requires the trial court to admit evidence of other crimes for the purpose of showing propensity, without regard to whether the evidence would other-

wise qualify for admission based on its logical and legal relevance. The Court held that the evidence thus impermissibly permits the jury to convict because it believes the defendant has a propensity to commit this type of crime rather than because the jury believes defendant committed the crime in question. *State v. Burns*, 978 S.W.2d 759, 762 (Mo. banc 1998). The same rationale would invalidate admission of evidence of prior child endangerment under this statute to prove propensity.

Although the instant case was tried before *Burns*, generally new rules governing the conduct of criminal proceedings are to be applied retroactively to those cases which are not yet final or are pending on direct review. *State v. Thurman*, 887 S.W.2d 403, 408 (Mo.App.1994). The record shows, and defense counsel admits, however, that defendant did not challenge the constitutionality of Section 566.025 either at trial or in his motion for new trial, and that he has failed to preserve this issue for appeal. "To preserve a constitutional question for appellate review, it must be raised in the trial court at the earliest opportunity consistent with good pleading and orderly procedure and be further preserved in a motion for new trial." *Letz v. Turbomeca Engine Corp.*, 975 S.W.2d 155, 166 (Mo.App.1997); *State v. Gateley*, 907 S.W.2d 212 (Mo.App.1995). This standard was not complied with here.

Even if *Burns* does not require exclusion of the prior crime here, however, there is another reason why the evidence of the fire was improperly admitted. The premise for admissibility of evidence of past crimes under Section 566.025 is that they show a propensity to commit the type of crime for which defendant is on trial. Defendant argues that evidence of his past charges for child endangerment involving the fire simply did not constitute proof that he had a propensity to commit the crime of child endangerment at issue here. We recently addressed a similar argument in *State v. Sage*, 977 S.W.2d 65 (Mo.App.1998), in which the State also attempted to introduce evidence of a prior act of child endangerment under Section 566.025 to show propensity. *Sage* held it unlikely that past crimes of child endangerment will

ever show a "propensity" of the defendant to commit the crime of child endangerment, because the evidence generally only shows the failure to exercise responsibility toward a child. *Sage* thus stated that it was not persuaded that "the failure to care for children is a particular "propensity" such as a tendency to exploit sexually for the purpose of the perverse sexual gratification of the perpetrator." *Id.*, at 71.

Application of the holding in *Sage* requires us to also consider whether evidence that Mr. Dunson left his children locked in the house, and as a result they were almost killed by an accidental fire, is relevant to show a propensity to endanger a child by hitting, whipping, or kneeing him or her in the abdomen. Like *Sage*, we do not find that the prior act is relevant to show a propensity to endanger a child in the manner now alleged. Accordingly, we find that the evidence of the prior fire should not have been admitted to show propensity.

The admission of improper evidence does not necessarily require reversal, however. We must determine whether the improper admission of this evidence prejudiced defendant. *Sage*, at 71. We find that it was not unduly prejudicial. First, defendant chose to testify in his own defense. When he did so, the State had the right to, and did, impeach him with evidence of his prior convictions regarding the fire. On his redirect examination, defense counsel then chose to go into the prior convictions in far more detail than the State had previously done, in an effort to justify defendant's conduct. A defendant cannot challenge the introduction of evidence by the prosecution when he presents evidence of the same nature. *State v. Osterloh*, 773 S.W.2d 213, 217 (Mo.App.1989); *State v. Schwendt*, 645 S.W.2d 385 (Mo.App. 1983).

Moreover, the State also introduced evidence of other incidents of defendant's abuse of his children. While defendant made a continuing objection to admission of this evidence at trial, on appeal he does not challenge its admission. In addition, the evidence of the conduct for which defendant was actually tried below was substantial, and

much of it was particularly graphic and bru-tal. In light of this evidence, evidence of defendant's locking his children in a house many years earlier, putting them at risk from a fire, was at best cumulative, and could not have affected the verdict. *See State v. Shaw*, 915 S.W.2d 775, 783 (Mo.App.1996); *State v. Griffin*, 876 S.W.2d 43, 45 (Mo.App. 1994); *State v. Alexander*, 875 S.W.2d 924, 931 (Mo.App.1994). Point IV is denied.

Judgment affirmed.

Presiding Judge ALBERT A. RIEDERER and Judge HAROLD L. LOWENSTEIN concur.