**STATE of Missouri, Plaintiff–Respondent,**

v.

**Marcus Lee BROUSSARD, Defendant–Appellant.**

No. 23624.

Missouri Court of Appeals, Southern District, Division 2.

Oct. 29, 2001.

Rosalynn Koch, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Karen L. Kramer, Asst. Atty. Gen., Jefferson City, for Respondent.

PHILLIP R. GARRISON, Presiding Judge.

Marcus Lee Broussard ("Defendant") was charged with three counts of forcible rape in violation of Section 566.030.[1] Following a jury trial, he was found guilty of one count of forcible rape, and was sentenced to twenty years. Defendant appeals.

Defendant does not challenge the sufficiency of the evidence supporting his conviction. The evidence, therefore, viewed in the light most favorable to the verdict, shows the following:

On the afternoon of July 31, 1999, Defendant and his co-worker, Keith Broussard ("Keith"),[2] drove Defendant's van to lunch. Both Defendant and Keith snorted some methamphetamine that Defendant had provided. Keith noticed a target sheet on the floorboard of the van and an empty box of gun shells and asked Defendant about it. Defendant said he had been target practicing with his pistol, and showed Keith the gun, a double action .380 semi-automatic handgun.

That evening after work, Defendant, Keith, and two other co-workers went to Foxy's, a topless bar in Springfield, Missouri. While at Foxy's, Defendant and Keith drank about a pitcher of beer each. Defendant and his co-workers then left

---

1. All statutory references are to RSMo 2000, unless otherwise indicated.

2. Although they share the same surname, Defendant and Keith Broussard are not related.

For purposes of clarity, we refer to Keith Broussard as "Keith." We mean no disrespect.

Foxy's and went to Regina's Cabaret. Before going into Regina's Cabaret, Defendant and Keith snorted methamphetamine. While at Regina's Cabaret, they each drank about two beers and a shot of hard liquor. Defendant and Keith then decided to go to Midnight Rodeo, a bar across the street from Regina's Cabaret. The other two men, however, decided to go back to the hotel where they were staying. After getting something to eat at a fast food restaurant, Defendant and Keith drove to the parking lot of Midnight Rodeo and smoked marijuana, which Defendant provided.

That same evening, the victim went to Midnight Rodeo to look for her sister. She did not find her sister, but talked with a couple of other people she knew and drank half a bottle of beer. About thirty minutes later, she left the bar and walked past Defendant's van in the parking lot. The passenger side window was down, and Keith was sitting in the passenger seat. The victim said to Defendant and Keith as she walked by, "[I]f you boys are using drugs then you need to share." One of them said, "[H]ey, come here." The victim turned around and walked back to the van. Defendant and Keith were not sure what the victim had said, so she repeated the comment. Defendant said that they had "a little bit of speed" and held up a baggie with some methamphetamine in it. The victim said she had been waiting on someone to bring her some speed, but he had never shown up. Defendant asked the victim how she liked to do methamphetamine, and she told him that she usually shot up. Defendant asked the victim if she had an "extra dart," meaning a syringe. The victim said she did.

The victim returned to her car to get her purse and a little pouch with syringes, bottled water, and a spoon. The victim went back to the van and got in. She told them to drive to the back of the parking lot, but Defendant insisted on driving somewhere else, so they left. They drove to a convenience store. While Keith was in the store purchasing some beverages, Defendant told the victim that his name was "Steve Sanchez" and that he was an electrician. Defendant would not tell the victim where he worked or lived. The victim told Defendant her name, and Defendant told her that Keith's name was "Brian."

Keith returned to the van with the drinks, and Defendant asked the victim if she knew of a good spot where they could shoot the methamphetamine. The victim wanted to go someplace where there were no houses around, and told Defendant and Keith that she knew of an old railroad bridge on East Sunshine.

Upon arriving at the bridge, the victim got out the syringes, a bottle of water she had in her purse, and a spoon. Defendant pulled out his bag of methamphetamine and put some in the spoon. They added water to the methamphetamine and mixed it up. Defendant took one syringe and tried to inject himself, but missed the vein. The victim asked Defendant if he wanted her to do it for him and he said yes, so she injected him. The victim used another syringe to inject herself. Keith snorted his methamphetamine through his nose.

The three then got out of the van and sat on a ledge underneath the railroad bridge. As they sat, the subject of tattoos came up. The victim showed them a tattoo she had on her ankle, and mentioned that she had another one on her tailbone, but did not show it to them. Keith showed her a tattoo of his son that he had on his left shoulder blade. Keith told the victim that he had it done at the Barking Dog Tattoo Parlor.

Defendant then said that when he did methamphetamine, he liked to have sex.

Defendant asked the victim to take her shirt off. The victim said, "[N]o, I don't believe that's what I want to do." Defendant pulled out a gun, put it to the back of the victim's head, cocked the hammer, and said, "[M]aybe you want to take it off now." The victim turned and saw the barrel of a handgun. She started trembling, and said, "[P]lease don't, just please don't. I'll do whatever you say, just why?" The victim stood up, and Defendant, still holding the gun, backed her into the corner and told her to stand up against the wall and take all of her clothes off. She complied. Defendant kept telling her to calm down. She told Defendant that she was cold and asked if they could go in the van. Defendant agreed and picked her up and carried her to the van. Keith did not follow.

Once inside the van, Defendant laid the gun down on the floor by the seat. Defendant made the victim lay down, and he had sex with her. A car then pulled up. Defendant was angry, and said, "I thought you was taking me someplace where, you know, we wouldn't be seen, you know, where there wouldn't be nobody around." Defendant, who had stripped, put his jeans on and got out of the van, but told the victim to stay in the back of the van. Defendant shouted at Keith and had him bring the victim's clothing to the van, but refused to let her put her clothes back on.

Keith drove, and Defendant got in the back of the van with the victim. She kept begging Defendant to take her back to her car. She told Defendant that she had a little boy and that she did not want to die. Defendant just kept saying that everything was going to be all right. Defendant said that all he wanted was "a little bit of sex."

They stopped again at what looked like an old train depot. Defendant had put the gun on the floor in back of the driver's seat. Defendant told the victim to get in the back of the van because they "needed to have sex again." She said no and begged Defendant to take her back to her car. Defendant promised the victim that everything would be all right. Defendant made the victim lay down, and he had sex with her again. The victim kept "asking for mercy" and telling Defendant not to hurt her. The victim kept talking about her son. Keith sat in the front of the van and did not participate in any way.

Defendant got back in the driver's seat and drove the van back toward Springfield. He turned into a neighborhood outside of Springfield. Defendant still would not allow the victim to put her clothes, but finally allowed her to put on a t-shirt. The victim asked Defendant to please go back into town. Keith held her hand and told her that everything would be all right and that he would make sure she got back and that nothing would happen to her.

Defendant parked the van and said that he wanted to have sex with the victim again. She begged him not to. Defendant said that he wanted her to get out of the van. Defendant opened up a black lockblade knife and laid it on the dash. At some point, Keith picked up the knife and slipped it into his pocket. The victim got out of the van, but she told Defendant that she was cold and got back inside the van. Defendant again had sex with her.

Defendant then told Keith to get out of the van. They went around to the back of the van, and he, told Keith not to tell anyone about that evening. Keith told Defendant that he was not going to say anything, but "this is all you." They both then got back into the van. As Defendant drove the van out of the neighborhood, he asked Keith if he would like to have oral sex with the victim. Keith said no, but Defendant demanded that Keith let her do it. Keith kept telling the victim that she did not have to do it if she did not want to,

and that he was sorry. The victim then briefly engaged in oral sex with Keith.

Defendant started to drive away from town, but the victim begged him to take her back to her car. Defendant then turned around and drove back into town. Defendant had Keith drive while he got in the back of the van with the victim. She asked him why he had the knife, and Defendant said it was to assure him that she was not going to try and run. The victim asked him to take her back to town or, at the very least, allow her to get dressed. She told him that she would walk away and say that she had never seen him. Defendant told her that they would go back into town. He then let her put her clothes back on.

Defendant had Keith drive by the Midnight Rodeo parking lot to make sure that there was no one there who might see them drop the victim off. They looped back around the parking lot again, but did not stop. As they looped around again, Defendant took a t-shirt and rolled it around his wrists. The victim noticed that the passenger side window was rolled down and she lunged for it. As she did so, Defendant put the rolled up shirt around her neck. She started screaming, "[N]o, no, what are you doing?" and grabbed onto the outside mirror. The shirt slipped from around her throat, and Defendant grabbed the shirt the victim was wearing. As she fell from the van, her shirt ripped and she landed on the ground. Although she had managed to grab her purse, she left her pager, wallet, and car keys in the van. Defendant told Keith to "take off and get out of here." The van then sped off.

Three men in a car at the intersection near Midnight Rodeo saw the victim fall out of the van, and they let her use their cell phone to call the police. She told the men that she had been raped, and they took her to meet the police. The victim told Officer Tatum DeWitt ("Officer DeWitt") that she had been raped. She had bruises on her right arm, a red mark on the upper part of her chest, and her shirt was ripped in the back. Officer DeWitt took her to the emergency room.

At the hospital, the victim told officers that she had been forcibly abducted from the parking lot of Midnight Rodeo. She did not mention that she had been using methamphetamine. She described Keith, Defendant, and the van. A sexual assault examination was conducted, and the DNA profile from the semen found on the victim was consistent with Defendant's blood standard. The frequency of the profile would occur once in every 23 quadrillion individuals.

The victim told police of Keith's tattoo, so they went to the Barking Dog Tattoo Parlor to see if anyone had a tattoo of a child done. They learned that the individual was Keith. Detective Mark Hall ("Detective Hall") met with Keith, who denied that there had been a kidnapping and reported that the victim came with them voluntarily. Keith told them Defendant's name and where to locate him. Detective Hall arrested Defendant, and after getting permission to search his room found a lock-blade knife which matched the description that the victim had given of the knife used in the rape.

The victim later told police that she had lied about the kidnapping and that she had approached the van and willingly went with Defendant and Keith that night. She picked Defendant's picture out of a photo lineup.

At trial, Defendant testified that he got the methamphetamine from Keith. He claimed that the victim offered him sex in exchange for more methamphetamine. He testified that Keith and he used fictitious names because he did not want his fiancée

to find out. Defendant claimed that he and the victim had consensual sex, and that she got upset when he told her they had no more methamphetamine. Defendant denied ever having a gun that evening.

At the close of the evidence, the jury returned a verdict of guilty on Count III for forcible rape, but acquitted Defendant on Counts I and II,[3] and assessed a punishment of twenty years imprisonment. Defendant appeals.

In his first point on appeal, Defendant contends that the trial court erred in denying the defense's request to call Pat Merriman ("Merriman") to testify concerning the phenomenon of "tweaking," and in denying the admission of a brochure entitled "There is No Safe Speed" into evidence because the phenomenon and the brochure were relevant to explain the victim's behavior on the night in question.

Prior to trial, the State filed a motion in limine asking that Defendant be barred from putting on any evidence as to the victim's prior drug use. The trial court said that Defendant could ask questions outside of the presence of the jury and if he showed that there was "a pattern there and she says she's been using meth for several days and hasn't slept for a week prior to this incident, then that probably goes to her ability to observe and remember." The trial court observed that if the defense counsel asked these questions in front of the jury, it would plant a seed in the mind of the jury "that long-time meth users are—hallucinate and are up for days" without any factual basis for it. Thus, the trial court said Defendant would have to lay a foundation outside the presence of the jury before he would be allowed to put the evidence before the jury. The trial court ruled that, in the meantime, it would sustain the State's motion in limine. The State also objected prior to trial to the testimony of Merriman and to the use of the pamphlet entitled "There is No Safe Speed" on the grounds that Merriman was not an expert and the information was not relevant. No ruling was made on the record at that time.

During the cross-examination of the victim, defense counsel asked her how long she had been up. The victim replied that she had slept all that afternoon and part of the evening. Defense counsel then asked her when was the last time she had used methamphetamine. The State objected, and the trial court reminded defense counsel that he was to do this questioning outside the presence of the jury. As an offer of proof, defense counsel then asked the victim when she had last used methamphetamine prior to the night in question. She said probably the afternoon before. She denied that she used methamphetamine regularly, and said she could not recall if she used methamphetamine on any other days. The victim testified that she was able to sleep when she used methamphetamine.

Defendant then, as an offer of proof, put Merriman on the stand. Defendant offered Merriman as an "expert in the area of narcotics and the affects of narcotics on a person." Merriman testified that in 1983 he was hired by the Buchanan County Prosecutor's Office to deal with narcotics crimes. In 1986, Merriman co-founded the Buchanan County Drug Strike Force. In 1990, Merriman was hired as the felony

---

**3.** Count I charged that Defendant committed forcible rape, based on the events that occurred at the railroad bridge. Count II charged that Defendant committed forcible rape, based on the events that occurred at the old train depot (Turner's Station). Count III charged that Defendant committed forcible rape, based on the events that occurred on Bittersweet Drive in a neighborhood outside of the city limits of Springfield, MO.

narcotics prosecutor in Greene County. Merriman had been involved in undercover investigations and dealt with drug informants. He testified that he was published in the Felony Drug Prosecution Handbook. The State interrupted at this point and said that they accepted that Merriman had done everything listed in his curriculum vitae.

Defense counsel asked Merriman if he knew what "tweaking" was. Merriman responded that it was a phenomenon that occurs with heavy methamphetamine users. When asked about some of the symptoms of "tweaking," Merriman gave an example of a woman who was taken into custody, acted perfectly normal, and then about an hour later was "literally hanging . . . from the light fixture there in the cell and swinging back and forth, they said, like a chimp." Merriman gave another example of a man who thought Merriman was his dead brother. He said the closest thing he had ever seen to it was the irrational behavior demonstrated by paranoid schizophrenics in mental hospitals. Merriman said that when someone is "tweaking" the person's ability to accurately recount events was not good. Merriman said that in training officers, he tells them that someone who is "tweaking" is "extremely paranoid," and that they are "incredibly strong and insensitive to pain." He stated that during the time people are up on methamphetamine they do not sleep. Defendant then offered the pamphlet, "There is No Safe Speed," as an offer of proof.

The trial court announced that it was not changing its ruling because all Merriman did "was talk about things that I already know, which have nothing to do with this case so far. You had him come up here and tell us that there are certain things that happen to people who are severely addicted to methamphetamine."

At the beginning of Defendant's case-in-chief, Defendant told the trial court that, if allowed, he would call Merriman to the stand. The trial court stated that it would not change its ruling, and that Merriman would not be allowed to testify. When asked what the grounds were for this ruling, the trial court replied that Defendant was not qualified as an expert witness to the affects of "tweaking" on a person's ability to recall and recount. The trial court also said that nothing to which Merriman testified in the offer of proof had anything to do with the case, in that Merriman had not reviewed any documents, talked to anyone in the case, or done anything by which he could gain an opinion concerning the victim's state of mind on the night of the incident. The trial court noted that it believed that this was an attempt by the defense to get into prior bad acts, and that the testimony was not relevant to the trial. The trial court stated that there had to be evidence from a witness that the victim was acting consistent with someone who suffered from a severe addiction to methamphetamine and absent that, general evidence regarding "tweaking" would not be allowed.

Defendant testified and explained that the victim had proposed a "swap out" of sex in exchange for methamphetamine. Defendant said that when he and Keith told the victim that they did not have any more methamphetamine, she got upset and started cussing. He stated that the victim screamed that she wanted to go to her dealer's house. He testified that she jumped out of his van and started screaming when they returned to Midnight Rodeo's parking lot, and that it scared him, so he took off in the van, leaving her in the parking lot.

Ultimately, the trial court stood by its original ruling on the motion in limine, but did allow Defendant to testify that the

victim had told him that she had been up for three or four days and was looking for more methamphetamine so she could stay up longer. The trial court noted that this went toward her ability to recount and recollect what happened that night.

■ Absent a clear abuse of discretion, an appellate court will not interfere with a trial court's ruling on the admission or exclusion of evidence. *State v. Nicklasson*, 967 S.W.2d 596, 619 (Mo. banc 1998). An abuse of discretion will be found when the trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *State v. Mathews*, 33 S.W.3d 658, 660 (Mo. App. S.D.2000). If reasonable people can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. *Id.*

■ "An offer of proof must demonstrate the relevance of the testimony offered, must be specific, and must be definite." *State v. Seiter*, 949 S.W.2d 218, 224 (Mo.App. E.D.1997). If an offer of proof consists of evidence which is admissible in part and inadmissible in part, the trial court is justified in rejecting the entire offer. *State v. Malicoat*, 942 S.W.2d 458, 460 (Mo.App. S.D.1997).

■ In Defendant's offer of proof, he offered a pamphlet entitled "There is No Safe Speed." There is no explanation on the record as to why the material in this pamphlet was relevant to Defendant's case. Defendant showed the pamphlet to Merriman, asked him if he had seen it before, observed that the pamphlet referred to "tweaking," and then asked Merriman what "tweaking" was. Merriman then voluntarily referred to the pamphlet and the pictures showing the physiological effect of prolonged methamphetamine use. Defendant later asked Merriman to look at the side effects listed in the pamphlet and asked Merriman whether he agreed with them. While Defendant used the pamphlet in his examination of Merriman on the offer of proof, he never made any argument indicating in what way the pamphlet would have been relevant. The offer of proof thus failed.

■ Moreover, the offer of proof failed because the pamphlet was inadmissible hearsay. Hearsay is any out-of-court statement used to prove the truth of the matter asserted. *State v. Sutherland*, 939 S.W.2d 373, 376 (Mo. banc 1997). Assuming Defendant thought the pamphlet relevant because it defined "tweaking" and gave symptoms of methamphetamine use, the pamphlet was being offered for the truth of the matter asserted to show that methamphetamine users "tweak," and that methamphetamine users are unable to sleep. Furthermore, Merriman's own testimony concerning the symptoms of "tweaking" contained inadmissible hearsay. When Defendant asked Merriman what the symptoms of "tweaking" were, Merriman replied:

I've got a case in Lawrence Country [sic] right now.... She was taken into custody on a routine traffic stop and, you know, acting perfectly normal, officers search her personal effects and find a syringe. Later we test the paraphanalia [sic] and it tests positive for methamphetamine.

And within an hour of the time that she was booked and processed, she's literally hanging from the, you know, from the light fixture there in the cell and swinging back and forth, they said, like a chimp.

Merriman's testimony revolves around what he was told by the officers who arrested, booked, and processed the woman.

The testimony is not based on what Merriman personally observed, and it was being used for the truth of the matter asserted therein.

Additionally, the essential test of the admissibility of expert testimony is whether such testimony will be helpful to the jury. *Fierstein v. DePaul Health Center*, 24 S.W.3d 220, 226 (Mo.App. E.D. 2000); *State v. Gola*, 870 S.W.2d 861, 864 (Mo.App. W.D.1993). Here, Merriman's testimony, as reflected in the offer of proof, was not relevant to the victim's behavior because it did not describe behaviors similar to those attributed to the victim by Defendant, and thus would not have helped the jury. When Merriman described "tweaking," he did not describe the symptoms or behaviors associated with it, but instead related anecdotes. He described a woman swinging from a light fixture and a man who thought Merriman was his dead brother. He made a general comparison to paranoid schizophrenics, and described a person who was "tweaking" as not being "on your wavelength." Defendant's description of the victim's behavior did not describe bizarre, inexplicable behavior, such as swinging from a light fixture, or delusions or paranoia. Defendant testified that the victim became angry when she discovered that they did not have any more methamphetamine, began screaming, and wanted to leave. Since Merriman's testimony was not in any way related to the alleged behavior of the victim as described by Defendant, Merriman's testimony was irrelevant and would have done nothing to aid the jury.

The trial court was also correct in concluding that Merriman was not a qualified expert to testify on the phenomenon of "tweaking." Defendant told the trial court that he wanted to show that the victim was deluded as to what happened that night due to her methamphetamine use, and

could not "tell the difference between making love at first and then all of a sudden she switched on a dime to now she's saying something bad happened." Merriman was not qualified as an expert to discuss the victim's mental state. As the trial court noted, a psychiatrist or psychologist would be needed to testify about "that type of mental abnormality."

Finally, Defendant has failed to show how he was prejudiced because of the absence of Merriman's testimony. The victim's testimony was entirely corroborated by Keith. Therefore, it was highly unlikely that the jury would have determined that the victim had misconstrued what had happened that night, even if they had heard Merriman's testimony about "tweaking." Furthermore, Defendant was able to elicit testimony as to how people who are "tweaking" behave through the cross-examination of patrolman Russell Donaldsen ("Donaldsen") of the Greene County Sheriff's Department. Donaldsen testified that "tweaking" was a reference to someone under the influence of methamphetamine. Donaldsen described a person who was "tweaking" as being "very agitated, very restless, they can't stop grinding teeth, moving. . . . [E]very time I've dealt with these people, these individuals, they seem to believe that some type of government agency is out to get them."

Consequently, the trial court's exclusion of Merriman's testimony and the pamphlet was not erroneous. Defendant's first point must be denied.

In Defendant's second point, he contends that the trial court erred in sustaining the State's objection to the defense's attempt to question the victim and Detective Hall about whether the victim said she had a drug problem and needed help, and in denying the defense's motion for a mistrial because "this evidence was

relevant to the issue of her consent to sexual activity as a trade for drugs."[4]

As part of an offer of proof, Defendant asked the victim if she had told Detective Hall that she had a problem with methamphetamine. The victim admitted that she had said that to Detective Hall, but could not recall if she told him that she needed help with her problem. Defendant made another offer of proof during the testimony of Detective Hall. Detective Hall testified that the victim had told him that she felt like she had a drug problem, and that she needed some help with it. Detective Hall also testified that he never asked the victim whether her drug usage affected her memory, her judgment, or her ability to recall what occurred that night.

Defendant told the trial court that this evidence went to the victim's state of mind. When the trial court asked what that had to do with whether she could or could not recall the events of the night in question, Defendant responded, "Because it goes into her admission that she is a drug addict." The trial court responded that whether or not she said she needed help with drugs did not indicate whether she was under the influence of drugs on the night in question to the point that she could not accurately recall the events of that night. Defendant referred to a pamphlet that listed the side effects of methamphetamine, including the inability to sleep, the belief that people are out to get them, and the inability to distinguish reality from illusion. Defendant argued that the victim had admitted she was a drug addict and that it was part of the *res gestae* of the case. The trial court disagreed, stating that there was no evidence

that the victim had actually been experiencing any of those symptoms on the night in question and that it considered Defendant's proposed cross-examination irrelevant. The trial court ruled that it was a prior bad act with which Defendant was trying to impeach the victim, and would not allow it.

 In this point, Defendant argues that this evidence was relevant to the issue of his guilt in that the victim's alleged drug problem provided her with a motive for exchanging sex for drugs, and therefore, made Defendant's testimony regarding the events of that evening more believable. Defendant, however, never raised this theory at trial. Because Defendant's theory on appeal is different from the grounds he asserted at trial, he has failed to preserve it for appellate review. *State v. McKibben*, 998 S.W.2d 55, 60 (Mo. App. W.D.1999). When a matter is not preserved for appellate review, reversal is appropriate only if the appellate court finds plain error. *Id.*

 To be entitled to relief under the plain error rule, Defendant must go beyond a mere showing of demonstrable prejudice to show manifest prejudice affecting substantial rights. *State v. Parker*, 856 S.W.2d 331, 332 (Mo. banc 1993). Defendant must demonstrate that manifest injustice or a miscarriage of justice will occur if the error is not corrected. *State v. Worthington*, 8 S.W.3d 83, 87 (Mo. banc 1999), *cert. denied* 529 U.S. 1116, 120 S.Ct. 1978, 146 L.Ed.2d 807 (2000).

 Absent a clear abuse of discretion, an appellate court will not interfere with a

---

4. Defendant contends in his point that the trial court erred in overruling his motion for a mistrial. In the argument section of his brief, Defendant, however, does not mention the motion for a mistrial. Where an appellant's point is not developed in the argument portion of his brief, it is deemed abandoned. *State v. Hamilton*, 996 S.W.2d 758, 761–62 (Mo.App. S.D.1999). Therefore, we will only review Defendant's claim of error regarding the State's objection to the cross-examination of the victim and Detective Hall.

trial court's ruling on the admission or exclusion of evidence. *Nicklasson*, 967 S.W.2d at 619. The trial court has broad discretion over the extent of the cross-examination, especially in criminal cases. *State v. Gardner*, 8 S.W.3d 66, 72 (Mo. banc 1999). An abuse of discretion will be found when the trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Mathews*, 33 S.W.3d at 660.

In the instant case, the absence of this evidence (that the victim told Detective Hall that she felt she had a drug problem and needed help) did not prejudice Defendant. If Defendant's concern was whether the victim could accurately perceive or recall the events of that night, her story was corroborated by Keith's testimony at trial. Additionally, if Defendant's concern was that the victim's admission of a drug problem was somehow relevant to show an alleged motive for exchanging sex for drugs, Defendant was not manifestly prejudiced. The jury already knew that the victim used drugs. Her own testimony established that she had suggested to Defendant and Keith that they share their drugs. Keith testified that the victim told her that she had been waiting on someone to bring her speed, but he had never shown up. The victim also had syringes, a spoon, and a bottle of water ready to use with the methamphetamine. This evidence informed the jury that the victim was a drug user. Evidence that the victim believed she had a problem with drugs would have added nothing to Defendant's contention that the victim had sex with him in exchange for drugs. Defendant's second point is therefore denied.

In his final point, Defendant contends that the trial court erred in sustaining the State's objection when Defendant tried to cross-examine Keith concerning his prior misconduct in stalking his girlfriend. Defendant argues that Keith opened the door to this evidence, and that he was prejudiced by not being allowed to question him about the stalking.

During direct examination, the State asked Keith whether the victim ever acted "crazy, or nutty, or out of control." Keith replied that the victim was acting like anyone would in that situation because it was "pretty scary." He went on to say, "I mean, it was still pretty scary for me. I couldn't imagine it happening to like my kid's mother or something, or anyone." Later on, the State asked Keith if he was trying not to watch the rape, and Keith replied, "Yeah. I didn't want to see anything like that. I mean, it's not something I think about doing to others. I mean, I don't need a gun to get laid, you know. I have some respect for women, you know. I have two sisters and stuff so I mean I was brought up in a well home. I don't enjoy watching people being raped."

Defense counsel then approached the bench and told the judge that he had evidence that Keith had once been charged with stalking and threatening to kill his girlfriend, the mother of his child. As an offer of proof, defense counsel presented a police report showing that Keith had threatened to kill his girlfriend and had been accused of stalking her. Defense counsel stated that he wanted to ask Keith if he could imagine killing his girlfriend. The State responded that they had not been provided with this information, that Keith could only be impeached by a conviction, and that there was neither a conviction nor a pending charge in the county where the alleged charges against Keith had been filed. The trial court sustained the State's objection and refused to allow

Defendant to cross-examine Keith on the alleged charges.

As previously noted, absent a clear abuse of discretion, an appellate court will not interfere with a trial court's ruling on the admission or exclusion of evidence. *Nicklasson,* 967 S.W.2d at 619. A mere arrest, investigation, or criminal charge that has not resulted in a conviction may not be used to impeach witness credibility. *State v. Francis,* 997 S.W.2d 74, 78 (Mo.App. W.D.1999). There are exceptions to this rule where the inquiry would demonstrate a specific interest of the witness, where the inquiry demonstrates a witness' motivation to testify favorably for the State, or where the inquiry demonstrates that the witness testified with an expectation of leniency. *Id.* None of these exceptions apply to the present case, as the charges filed against Keith were not pending, and thus there was no evidence that Keith had a motive to testify favorably for the State or that he had a particular interest in the outcome of the case.

Defendant argues, however, that he should have been allowed to question Keith about the charges because Keith allegedly opened the door and put his character at issue "when he testified to his upbringing and attitudes toward [Defendant's] behavior." Keith's testimony stated his attitude as to rape, but the alleged charges against Keith had nothing to do with any sort of sexual offense. The claim that Keith may have stalked his girlfriend did not contradict his testimony that he believed forcing someone to have sex is wrong. Therefore, Keith did not open the door to evidence of alleged charges against him for stalking his girlfriend.

In addition, while it is true that a defendant can impeach a prosecuting witness with prior inconsistent statements, the impeachment may not concern an immaterial or collateral matter. *State v. Dunson,* 979 S.W.2d 237, 242 (Mo.App. W.D.1998). "A matter is considered to be collateral if the fact in dispute is of no material significance in the case or is not pertinent to the issues developed." *Id.* A matter is not collateral if the alleged discrepancy involves a crucial issue directly in controversy or relates to any part of the witness' account of the background and circumstances of a material transaction, which as a matter of human experience he would have been mistaken about if his story were true. *Id.* No extrinsic evidence is permitted on cross-examination on a collateral matter. *Id.*

Here, Keith's testimony as to how he felt about rape in general was immaterial and collateral. Further, how Keith felt about his girlfriend was completely immaterial and collateral to how Defendant treated the victim. The police report, therefore, would have been extrinsic evidence used to impeach Keith on an immaterial, collateral matter, and should not have been allowed.

The trial court did not err in sustaining the State's objection to Defendant's attempt to cross-examine Keith about alleged charges against him for stalking his girlfriend. Defendant's third point is denied.

The judgment of the trial court is affirmed.

PREWITT, J., and RAHMEYER, J., concur.